**UNITED STATES of America,
Plaintiff–Appellee.**

v.

**Juan Francisco VALDEZ,
Defendant–Appellant.**

No. 87–3338
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Nov. 22, 1988.
Rehearing and Rehearing En Banc Denied
Dec. 19, 1988.

428

Anthony F. Gonzalez, Howard J. Shifke, Tampa, Fla., Terrence E. Kehoe, Orlando, Fla., for defendant-appellant.

Marylyn Barnes, Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before WILLIAMS, HIGGINBOTHAM and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Juan Francisco Valdez appeals his conviction on multiple charges arising out of a scheme to introduce a shipload of marijuana into this country. His appeal revolves around the loss of much of his trial transcript. We reject Valdez' arguments because he neither establishes error nor asserts with particularity how the unavailability of portions of the trial transcript prejudices his ability to do so.

## I.

A jury convicted Valdez of conspiracy to possess marijuana with intent to distribute and conspiracy to import marijuana, along with the substantive offenses of importing and possessing the marijuana. The charges emanated from a single scheme to bring more than 30,000 pounds of marijuana into the country in July 1986. After trial, portions of the trial transcript representing 5½ days of the eight-day trial were stolen from the court reporter's car. The missing portions include the closing statements, the court's jury charge, and much of the testimony.

The government's case rested chiefly on co-conspirator Stanley Yancey, a Louisiana businessman who helped to plan the scheme and testified as the government's star witness under a plea bargain agreement. Yancey's testimony is in the record and we describe his testimony below in some detail.

Yancey testified that the scheme originated in January 1986 when he visited a longtime friend, John Ledet, at the federal penitentiary in Big Spring, Texas. Yancey, Ledet and Ledet's cellmate, Billy Geittmann, agreed that Geittmann would use his supply connections to arrange for marijuana to be loaded on a Colombian ship. Yancey was to provide a boat to meet the Colombian ship in the Gulf of Mexico, where the marijuana would be transferred to the boat and delivered to Louisiana for storage and distribution.

Billy Geittmann brought his brother, Gunther, into the conspiracy to serve as Billy's liaison with the conspirators while he finished his prison term. Billy, Gunther and Yancey met in Dallas on April 1, 1986, for more preliminary planning while Billy was on a one-week prison furlough. In early May 1986, Yancey met with Gunther Geittmann, Juan Mendez, and a man known to Yancey only as "Roger" or "Paco," in Gunther's hotel room in New Orleans. The four settled on May 31, 1986, as the rendezvous date, set the location for the rendezvous between the Colombian mothership and the boat Yancey would provide, and discussed communications problems. Yancey, Mendez and Roger also toured potential delivery and storage sites near Houma, Louisiana.

Yancey, working through co-conspirator Jerry Galliano, spent the following weeks arranging for a boat, crew, stash houses and truckers to carry the marijuana. On May 25, 1986, Yancey and Gunther Geittmann met with Juan Mendez and Roger in Miami. Mendez introduced them to appellant Juan Francisco Valdez, who was known to Yancey as "Frank," and Jose Alberto "Al" Gonzalez.

As the meeting wore on, Yancey realized that Valdez "was the man [with whom] I'd really need to discuss all of the fine points in the deal because he was, you know, running the show pretty much." Valdez asked Yancey during the meeting if his boat could carry more marijuana than the 25,000 pounds Yancey originally had planned to carry, so that the operation could take full advantage of this opportunity to meet with the mothership. When Yancey told Valdez that his boat could carry up to 45,000 pounds of marijuana, Valdez responded, "We can do it." The men also agreed to push the rendezvous date back a week to June 7, 1986, and discussed the locations of the unloading site and stash houses in Louisiana.

Yancey met with Valdez, and a man known to Yancey only as "Mark," in New Orleans during the first week of June to locate stash houses and an apartment for Valdez. Valdez indicated that he would keep 5,000 pounds of the marijuana to store and distribute himself. Juan Mendez also flew into New Orleans and stayed overnight, but then returned to Miami to maintain radio communications with the Colombian suppliers. Meanwhile, further delays pushed the rendezvous date back another week to June 14, 1986. By June 11, 1986, the boat Yancey had arranged was fueled, loaded with supplies and ready to leave for the rendezvous. However, Yancey and Valdez received word from Mendez that afternoon that Colombian authorities had apprehended the mothership in Colombia. With the rendezvous delayed again, Yancey and Jerry Galliano dis-

patched their boat to pick up another load of marijuana in Panama.

On July 8, 1986, co-conspirator Jose Alberto Gonzalez called Yancey from Miami to tell him that another mothership would leave Colombia and reach the rendezvous point in several days. Yancey scrambled to find another pick-up boat because the first was unavailable; on July 13, Jerry Galliano introduced Yancey to Elmo Pitre, a friend of Galliano's who agreed to charter a boat for the rendezvous. However, Pitre contacted the government almost immediately and became a paid informant.

Pitre created more immediate problems for Yancey when he demanded his $38,000 fee from the co-conspirators in advance. Yancey relayed the demand by telephone to Valdez, who offered to show the money to Pitre but refused to give it to him before the rendezvous. On July 14, Yancey, Valdez and three other co-conspirators drove to Golden Meadow, Louisiana, to look over Pitre's boat and resolve the payment dispute. One of the other three co-conspirators showed the money to Pitre in Valdez' presence, but Pitre infuriated Valdez when he still refused to release the boat before payment. Billy Geittmann, out of prison by then, resolved the dispute when he agreed to ride on the boat to the rendezvous if the others would pay Pitre up front.

Billy Geittmann arrived in New Orleans on July 15; Yancey, Valdez, Billy Geittmann and other co-conspirators drove to Fouchon, Louisiana, to watch Pitre's departure preparations. Another co-conspirator, who was carrying a radio, boarded Pitre's boat and talked with Valdez over the radio once the boat was underway. After the boat left, Valdez and another co-conspirator carried Pitre's $38,000 payment to Pitre's truck and placed it on the passenger side of the front seat.

On July 18, 1986, Yancey told Valdez and other co-conspirators to come to Houma, Louisiana, to wait for the delivery boat's arrival. Yancey called Pitre, who said the boat would arrive at 6:00 p.m. the next day. Pitre also told Yancey that he had arranged for a second boat to meet the mothership because all of the marijuana would

not fit in the first boat. This news angered Valdez and two other co-conspirators, who feared that they would lose control of the excess marijuana.

United States Customs and DEA agents arrested Yancey on July 19 at his parents' house, where he had gone to wait for the arrival of the shipment. Yancey agreed to cooperate with the agents; shortly afterwards, Jose Alberto Gonzalez paged Yancey on his beeper to check on the shipment's status and the agents taped the call. The agents also taped a second telephone conversation, in which Gonzalez told Yancey the government had seized the main delivery. But Gonzalez and the other co-conspirators still wanted to recover the excess marijuana that did not fit on the first boat, so Gonzalez and Yancey agreed that Yancey would meet them at a motel in Kenner, Louisiana.

When Yancey and the agents arrived in Kenner, Yancey identified Gonzalez and Juan Mendez and the agents arrested them. Valdez arrived shortly afterwards and was arrested after Yancey identified him to the agents.

The government indicted twenty-one participants in the conspiracy. Eighteen defendants pleaded guilty to one or more counts of the indictment. The indictment was dismissed against another defendant. A jury convicted Juan Valdez and Juan Mendez on all four counts; the district court sentenced Valdez to three concurrent ten-year prison terms for the first three counts, and a consecutive three-year term for the fourth count.

On appeal, Valdez challenges the sufficiency of the evidence, asserts a variety of district court errors, and contends that prosecutorial misconduct in closing argument deprived him of a fair trial. Above all, Valdez argues that the incomplete trial transcript irreparably harms his ability to appeal these points.

II.

Valdez filed a motion for reversal, discharge and immediate release after the district court disclosed that the full transcript

of the trial was unavailable. This court denied the motion and remanded so the trial court could determine whether the record could be reconstructed. The trial court concluded that reconstruction was not feasible, after which Valdez renewed his motion. This court denied the motion and ordered full briefing on the merits to guide us in determining whether the lack of a complete record prejudiced Valdez' appeal.

■ Where, as here, trial counsel also represents the criminal defendant on appeal, loss of a portion of the complete trial record does not require automatic reversal. To obtain reversal, the defendant must make a specific showing that the incomplete record "visits a hardship upon [the appellant] and prejudices his appeal." *United States v. Renton*, 700 F.2d 154, 157 (5th Cir.1983); *United States v. Selva*, 559 F.2d 1303, 1305–06 (5th Cir.1977). As this court reasoned in *Selva*, "The attorney, having been present at trial, should be expected to be aware of any errors or improprieties which may have occurred during the portion of the proceedings not recorded." 559 F.2d at 1306. This rule defeats Valdez' initial claim that the full record's unavailability requires blanket reversal. We address Valdez' remaining points of error in turn in light of this standard.

## III.

Valdez argues that the evidence was insufficient to prove his guilt beyond a reasonable doubt. This court must affirm the jury's conclusion if a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Michelena–Orovio*, 719 F.2d 738, 742 (5th Cir.1983) (en banc), *cert. denied*, 465 U.S. 1104, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984). Valdez' argument fails in light of the testimony of Stanley Yancey, the government's star witness and the only witness whose complete testimony has survived. The facts, established by the government through Yancey's testimony as outlined above, are sufficient to support the conviction.

■ In a conspiracy case such as this the government must prove beyond a reasonable doubt that the (1) conspiracy existed; (2) defendant knew about it; and (3) defendant voluntarily joined it with that knowledge. Id. Here, Yancey's testimony established the first requirement by virtue of meetings dating from January 1986, Yancey's efforts to get the boat and plan for arrival of the marijuana, and the marijuana's arrival on July 19, 1986, after the rendezvous. On the critical second and third requirements, the government also met its burden. Yancey testified in detail about at least four meetings he had with Valdez during the operation's planning and execution stages; at their first meeting, Valdez persuaded Yancey to increase the marijuana load size and assured Yancey, "We can do it." Valdez also met with boat broker/informant Elmo Pitre in Yancey's presence to set rendezvous times and payment procedures for the chartered boat that brought the marijuana to Louisiana. Valdez and several co-conspirators met with Pitre a second time to confirm the boat's departure time. The broker received his fee at that meeting, either by Valdez' own hand or in Valdez' presence. Pitre's direct testimony, which also survived, does not contradict Yancey's testimony and corroborates much of it. Significantly, Valdez refers to no trial testimony that contradicts the government's evidence of Valdez' participation in the conspiracy as outlined above.

In his next attack, Valdez asserts that the trial court allowed Yancey and four other witnesses to recount co-conspirator hearsay in violation of *United States v. James*, 590 F.2d 575, 582 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Although Valdez cannot recall the district court making a *James* ruling on the admissibility of co-conspirator hearsay, the record contains a docket entry dated March 18, 1985, stating, "Court rules on *James* findings." The critical questions here are whether (1) a conspiracy existed; (2) the declarants and Valdez were members of that conspiracy; and (3) the statements were made during the course of and in furtherance of the conspiracy. *United*

*States v. Stanley,* 765 F.2d 1224, 1243 (5th Cir.1985); Fed.R.Evid. 801(d)(2)(E).

Valdez complains of two instances of inadmissible hearsay during Yancey's testimony. In the first, Yancey testified to statements made by Billy Geittmann and Gunther Geittmann when Yancey met with them on April 1, 1986, in Dallas. At that meeting, the three men set May 31 as the tentative rendezvous date and agreed that Gunther would provide money to Yancey to cover the expenses of arranging a delivery boat. In the second instance, Yancey testified about a conversation in early May 1986 between Yancey, Gunther, Juan Mendez and "Roger" in Gunther's hotel room in New Orleans. As indicated above, specific plans were made at this meeting to import the marijuana.

■ Yancey's testimony supports the conclusion that the men who participated in these two meetings were members of the conspiracy with appellant; that same evidence supports the view that the communications out of which the challenged statements were made were for the purpose of planning the drug importation scheme. The district court was thus entitled to find that the statements were made by co-conspirators during the course of the conspiracy and in furtherance of that conspiracy. Moreover, since *James,* the Supreme Court has determined that courts can use a co-conspirator's statement itself to determine if this hearsay exception applies. *Bourjaily v. United States,* 483 U.S. 171, ___, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144, 156 (1987). See also *United States v. Perez,* 823 F.2d 854, 855 (5th Cir.1987). In sum, this evidence easily satisfies the government's *James* burden for admission of co-conspirator hearsay from the April meeting in Dallas and the May meeting in New Orleans.

■ We reject Valdez' remaining *James* complaints for lack of specificity. Without identifying any statement by a particular declarant, Valdez makes a blanket hearsay objection to four other witnesses' testimony. These references to erroneous district court rulings are too vague to permit us to address them. Further, Valdez' general assurances to us that a complete record would permit him to demonstrate the error are insufficient for him to establish that the absence of a complete record "visits a hardship" on him or "prejudices his appeal." *Selva,* 559 F.2d at 1305–06; *Renton,* 700 F.2d at 157.

Next, Valdez claims that the trial court erroneously admitted testimony by co-conspirator Gunther Geittmann regarding more than twenty conspiracies beyond that charged in the indictment, thus creating a material variance between the indictment and the government's evidence under *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1237, 90 L.Ed. 1557 (1946). The government asserts that Geittmann's reference to other conspiracies occurred only during Valdez' efforts to impeach him and the government's own efforts to blunt that impeachment.

■ Once again, Valdez' vague assertion that Geittmann testified about multiple conspiracies lacks the necessary specificity to assign error. Although Valdez recalled from the trial testimony that Gunther Geittmann mentioned at least twenty other conspiracies he fails to describe (1) the substance of this testimony; (2) how this testimony related to the conspirators in this case, particularly Valdez himself; or (3) how evidence of these additional conspiracies could have confused the jury or prejudiced Valdez. Moreover, Valdez has failed to explain how the missing record portions would permit him to show any of the above. We note that "[i]f the government sufficiently supports its charge of a single conspiracy, evidence at trial of multiple conspiracies does not of itself create a material variance...." *United States v. Sutherland,* 656 F.2d 1181, 1189 n. 5 (5th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982).

■ Valdez next would have us find reversible error in the trial court's refusal to grant his severance motions. But Valdez' conclusory assertions that the guilt of co-defendant Juan Mendez washed over him as well establishes neither error nor the specific prejudice necessary to reverse for

lack of a full record. The record reflects that Yancey testified extensively about both Mendez' and Valdez' participation in the conspiracy. Even assuming that the government's case involved a quantitative and qualitative difference in the evidence implicating Mendez, this alone does not establish an "extreme case" that justifies severance. See *United States v. Harrelson*, 754 F.2d 1153, 1175 (5th Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985).

▮ In addition, Valdez claims that missing testimony reflecting co-defendant Mendez' "many incriminating statements" would justify severance under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). But beyond labelling Mendez' statements as incriminating, Valdez has not favored us with any particulars of these statements. These vague assertions are not sufficient to raise a potential *Bruton* violation. Nor has Valdez explained how these out-of-court statements by Mendez "clearly implicate[d]" Valdez. See *United States v. Basey*, 816 F.2d 980, 1005 (5th Cir.1987). Finally, Valdez has not demonstrated any specific prejudice from the record's unavailability. We reject this claim.

In his next point of error, Valdez argues that the trial court impermissibly limited cross-examination of (1) Yancey and co-conspirator Gunther Geittmann regarding their plea bargain agreements; (2) Elmo Pitre, the boat broker informant, regarding a $21,000 payment he received from the government for his information; and (3) Customs Agent Thomas O. Mitchell regarding the department's forms for arranging payment for information.

▮ The record contains the complete transcript of Yancey's testimony; our review of that testimony reveals no merit to Valdez' argument that he did not have a full opportunity to cross-examine Yancey. Valdez' questioning of Yancey covers ninety-seven pages of the surviving record; it included an exhaustive inquiry into the plea bargains and his decision to testify for the government.

▮ As for the cross-examination of Gunther Geittmann and Pitre, Valdez' vague assertions are inadequate to demonstrate error or allow us to conclude that the missing record has undermined his efforts to pinpoint error. Valdez does not represent that the district court limited his cross-examination regarding Geittmann's plea bargain in this case or in any other specific regard; Valdez instead points to purported plea bargains Geittmann made in other jurisdictions.

Valdez complains only that the district court limited his inquiry into the "details" of Pitre's payment, which the government brought out on direct examination. But Valdez does not tell us what questions the district court refused to permit him to ask. We cannot determine from Valdez' complaints whether the "details" he wished to expose encompass how the $21,000 fee was set, for example, or merely a redundant effort by Valdez to stress the same information generated on direct examination. Similarly, Valdez fails to describe with particularity how the district court blocked his efforts to cross-examine the United States Customs Service agent about the service's "Purchase of Information/Evidence Transaction Receipt," which lists the sums paid to Pitre "for information and active participation" in the case.

▮ Valdez also asserts that the trial court improperly admitted into evidence a gun, which was registered to Valdez and discovered in a car used by the co-conspirators as they prepared for the delivery boat's arrival in Louisiana. The gun's presence in the vehicle was probative evidence of Valdez' knowledge of and intent to participate in the conspiracy. See *United States v. Lippner*, 676 F.2d 456, 463 (11th Cir.1982) (brass knuckles allowed jury to infer that defendant "knew he was involved in an illicit transaction and had intentionally taken steps to protect his interest"); *United States v. Killian*, 639 F.2d 206 (5th Cir.), *cert. denied sub nom. Frunk v. United States*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981). We cannot say that the trial court abused its discretion in concluding that the gun's proba-

tive value outweighed its prejudicial potential. See *United States v. Lassiter*, 819 F.2d 84 (5th Cir.1987). Nor has Valdez demonstrated specific prejudice from the lack of a complete record on this point.

Finally, Valdez claims that the government infringed his fifth amendment rights in its closing argument by commenting on his failure to testify. Valdez asserts that "the government's argument was that its case had not been refuted." Even assuming this version of the closing argument is true, it falls within the range of permissible closing argument. *See United States v. Guzman*, 781 F.2d 428, 432 (5th Cir.), *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986); *United States v. Berkowitz*, 662 F.2d 1127, 1136 (5th Cir.1981).

### IV.

In sum, we find no merit in Valdez' vague claims of insufficient evidence, district court errors in admission of evidence and conduct of trial, or prosecutorial misconduct. Essentially, Valdez tries to persuade us that this haystack really did contain a needle. We require a more precise description of that needle and its location before we can remand his case and instruct the district court to look for it. The trial court's judgment is

AFFIRMED.