**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Heriberto RUIZ, a/k/a Echeverry, Jorge Marisio–Gonzalez and Valentin Montero,
Defendants–Appellants.**

**No. 92–7108.**

United States Court of Appeals,
Fifth Circuit.

March 22, 1993.

---

13. *See, e.g., Lindell,* 881 F.2d at 1320–21.

Yale L. Galanter, Miami, FL, for Heriberto Ruiz.

Debra L. Allen, Jackson, MS (Court–appointed), for Marisio–Gonzalez.

Richard T. Starrett, Asst. U.S. Atty., George Phillips, U.S. Atty., Jackson, MS, for plaintiff-appellee.

Before POLITZ, Chief Judge, JOLLY, and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Heriberto Ruiz–Echeverry and Jorge Marisio–Gonzalez appeal their convictions for conspiracy to import cocaine, and for felony possession of cocaine. Gonzalez also appeals from his conviction for interstate travel in aid of racketeering.[1] We find no reversible error. We AFFIRM.

## I

In the mid–1980s, Nelson Clavijo, Stephen and Jeffrey Giachelli, and others conspired to import cocaine from South America into the United States by concealing it in shipments of barbed wire.

The first shipment at issue here, which contained 900 kilograms of cocaine, arrived in Jackson, Mississippi, in August 1987. Carlos Moreno–Sanchez designed and oversaw the construction of false walls for concealment of the cocaine in the shipping containers. Prior to the arrival of the cocaine in 1987, Moreno traveled to Denver, Colorado, and recruited Montero and Gonzalez to assist in unloading the shipment. Moreno gave them enough cash to purchase airline tickets from Denver to Jackson. The co-conspirators, including Montero, Gonzalez, and Ruiz, met in Jackson and unloaded the cocaine. Later they rented a truck and took the cocaine to south Florida for distribution.

In June 1988, the co-conspirators imported a second shipment consisting of two containers of barbed wire in which 1750 kilograms of cocaine were concealed. As with the previous shipment, the co-conspirators, including Ruiz, met in Jackson and

---

1. Valentin Montero, who was convicted along with Ruiz and Gonzalez, died during the pendency of his appeal.

unpacked the cocaine. Later they rented trucks and took the cocaine to south Florida for distribution. Gonzalez and Montero did not participate in the 1988 shipment.

Moreno was arrested in January 1989, when he attempted to smuggle approximately 5,000 pounds of cocaine into the port of New Orleans, Louisiana. He pleaded guilty and agreed to cooperate with the government.

## II

Ruiz and Gonzalez were charged in a multi-count indictment, along with Montero, the Giachelli brothers, Nelson and Ivan Clavijo, and Miguel Vargas. The Giachelli brothers and Vargas pleaded guilty. Vargas and Stephen Giachelli testified for the government at trial. Nelson and Ivan Clavijo are fugitives, and had not been apprehended at the time of trial. Ruiz was charged with (1) conspiracy to import, possess, and distribute 900 kilograms of cocaine in 1987; (2) possession of 900 kilograms of cocaine with intent to distribute it; (3) conspiracy to import, possess, and distribute 1750 kilograms of cocaine in 1988; and (4) possession of 1750 kilograms of cocaine with intent to distribute it. Gonzalez was charged with conspiracy and felony possession of cocaine with respect to the 1987 load, and with interstate travel in aid of racketeering. The jury found both defendants guilty. Ruiz was sentenced to 211 months of incarceration; Gonzalez was sentenced to 168 months of incarceration.

## III

### A

■ Prior to trial in November 1991, Ruiz requested a pretrial hearing to determine the admissibility of co-conspirator statements. The district court denied the motion. Ruiz contends that the district court erred by failing to make a preliminary determination that co-conspirator statements were admissible. In the alternative, he contends that the district court

did not apply the required legal standard to determine the admissibility of such statements. We review these evidentiary rulings only for abuse of discretion. *United States v. Triplett*, 922 F.2d 1174, 1180–81 (5th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2245, 114 L.Ed.2d 486 (1991).

### (1)

As an initial matter, we reject the government's contention that Ruiz failed to identify adequately the co-conspirators' statements that he contends the district court erroneously admitted. *See United States v. Valdez*, 861 F.2d 427, 432 (5th Cir.1988) (defendant's failure to identify particular objectionable hearsay statements precluded review of district court's ruling), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 844 (1989). *Valdez* is distinguishable, because a portion of the record had been lost in that case, and the defendant's objections were too vague to permit meaningful appellate review. No such obstacles are present in this case.[2]

### (2)

■ Ruiz contends that the district court erred by failing to conduct a pre-trial hearing to determine the admissibility of co-conspirator statements. We disagree. In *United States v. James*, 590 F.2d 575 (5th Cir.) (*en banc*), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), our court held that such determinations need not be made prior to trial in all cases: "If [the district court] determines it is not reasonably practical to require the showing to be made before admitting the evidence, the court may admit the statement subject to being connected up." *Id.* at 582. The district court took that approach in this case, and did not abuse its discretion in doing so.

### (3)

■ Ruiz also contends that the district court applied the wrong legal standard—a "prima facie test" rather than a "preponderance of the evidence" test—in determin-

2. We also note that the district court granted Ruiz a standing objection to all hearsay statements by his alleged co-conspirators.

ing that the co-conspirator statements were admissible.

■ As Ruiz correctly notes, co-conspirator statements are admissible only if the prosecution proves, by a preponderance of the evidence, "(1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statements were made during the course and in furtherance of the conspiracy." *James*, 590 F.2d at 582. The district court may consider the co-conspirator statements in determining whether the prosecution has met its burden. *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987); *see also Triplett*, 922 F.2d at 1181.

At the close of the government's case, the district court made the following findings with respect to the existence of a conspiracy:

.... The Court first will make a ruling on the issue of the existence of conspiracies charged. The Court adopted the procedure of not holding a *James* hearing before allowing the witnesses to testify as to alleged statements made by co-conspirators.

The Court finds that there is ample evidence to make a prima facie case by a preponderance of the evidence, that the two conspiracies that are charged in the indictment did exist, that the Defendants who are on trial in this case and who are charged in the two separate conspiracies alleged in the indictment, the 1987 and 1988 conspiracies, were, in fact, members of the conspiracy, that the statements of co-conspirators who have been—which have been admitted into the record were made at times when the conspiracies existed and that they were made in furtherance of those conspiracies.

The district court's use of the phrase "prima facie case by a preponderance of the evidence" arguably is ambiguous. *But see Triplett*, 922 F.2d at 1181. Its ruling, however, when considered in context, clearly reflects that it applied the appropriate legal standard in making the required findings.

Those findings are amply supported by the evidence.

## B

■ Ruiz contends that the district court erred by admitting photographs of him with some of his co-conspirators, because the photographs are irrelevant and inflammatory. A customs agent took the photographs in Memphis, Tennessee, in July 1988. They depict Ruiz, Nelson Clavijo, and Vargas. We review the district court's evidentiary ruling for abuse of discretion. *Triplett*, 922 F.2d at 1180–81.

The photographs are relevant, because they depict Ruiz with his co-conspirators at a time when they were acting in furtherance of the conspiracy. Moreover, Ruiz does not explain, nor can we discern, how the photographs could be inflammatory or prejudicial. Accordingly, we conclude that the district court did not abuse its discretion by admitting the photographs.

## C

Next, Ruiz contends that the district court committed reversible error when it limited his cross-examination of Moreno. Moreno was one of the leaders of the conspiracy. He was charged in a separate indictment, pleaded guilty, and testified against his co-conspirators. On cross-examination, counsel for Ruiz attempted to question Moreno about whether he had reported his earnings from his conspiratorial activities on his tax returns. The district court sustained the prosecutor's objection, ruling that the evidence was not relevant. The district court also limited Ruiz's attempt to question Moreno about whether he had lied to a state court judge who released him on probation. Between the 1987 and 1988 cocaine shipments, Moreno had pleaded guilty to state charges of kidnapping, and had promised, as a condition of his probation, that he would not commit any further crimes. Ruiz contends that this information was essential to his defense, because Moreno was one of the government's key witnesses, and his credibility was a crucial factor.

"Limitation of the scope and extent of cross-examination is a matter committed to the sound discretion of the trial judge reviewable only for a clear abuse of that discretion." *United States v. Merida,* 765 F.2d 1205, 1216 (5th Cir.1985).

■ Although the evidence Ruiz sought to elicit undoubtedly was relevant to Moreno's credibility and motive for testifying, much of it ultimately was before the jury. In response to Ruiz's questioning, Moreno admitted that he did not file tax returns in 1983 and 1984. Although the district court sustained the government's objection to that line of questioning pursuant to Fed. R.Evid. 403, it did not specifically instruct the jury to disregard Moreno's responses. Moreno then admitted that he had made over a million dollars from his various drug transactions. The district court did not abuse its discretion by refusing to allow Ruiz to question Moreno further about his payment of taxes.

■ We also find no abuse of discretion with respect to the district court's limitation of cross-examination about Moreno's kidnapping conviction and the terms of his probation. On direct examination, Moreno testified that, between the 1987 load and the 1988 load, he was involved in an unrelated cocaine transaction, and ended up in jail. He testified further that Nelson Clavijo contacted him while he was in jail regarding plans for the 1988 cocaine shipment. The prosecutor asked Moreno to describe the unrelated transaction, and explain why he was in jail, but Montero objected. The prosecutor argued that this background information was relevant to Moreno's credibility, but the district court sustained Montero's hearsay objection.

During cross-examination by Ruiz's counsel, Moreno testified that he "got into some trouble in Miami" between the 1987 and 1988 cocaine shipments to Mississippi. However, he testified that he was not in jail on a cocaine charge. The prosecutor objected when Ruiz's counsel asked Moreno why he was in jail, arguing that he had

tried to elicit that information on direct examination. The district court sustained the prosecutor's objection, but allowed Ruiz's counsel to ask Moreno whether he had been convicted of another crime. Moreno then testified that he was in jail because he had been convicted of kidnapping. Although the district court sustained the prosecutor's objection when Ruiz's counsel asked Moreno what sentence he received, Ruiz was able to establish that Moreno was "let out of jail." During cross-examination by Montero's counsel, Moreno admitted, without objection, that he was placed on probation after pleading guilty to the kidnapping charges.

Although the district court did not allow defense counsel to question Moreno about whether he violated the terms of his probation, we find that the testimony, considered as a whole, refutes Ruiz's contention that he was unable to adequately attack Moreno's credibility. Ruiz questioned Moreno at length about alleged inconsistencies between his testimony at trial and his testimony before the grand jury, and was able to establish that Moreno believed that he was immune from prosecution for numerous prior crimes; that he had traveled using an assumed name and a black-market passport; and that he had lied to the authorities on other occasions.[3]

. D

■ Ruiz contends that the district court erred by refusing to strike the following statement the prosecutor made during his closing argument:

You are the arbiters of truth. You are the ones who stand between the citizens of this country and an injustice, crimes that were committed against the nation in which we live.

Ruiz argues that the prosecutor's statement was an impermissible appeal to passion or prejudice. We disagree. The quoted statement was immediately preceded by the following: "What you decide in this

---

**3.** We also note that the prosecutor tried to bring out the information about the kidnapping charge on direct examination, but was prevented from doing so when the district court sustained Montero's hearsay objection.

case should be based on the law, based on the evidence that you have heard." It is well-settled that, unless the prosecutor intended to inflame, "an appeal to the jury to act as the conscience of the community is not impermissible." *United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir. Unit B 1981) (citation omitted), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). The prosecutor's statements were merely a plea to the jury to do its duty— the record reveals no evidence of an intent to inflame.

### E

■ Finally, Ruiz contends that the evidence was insufficient to convict him of any crime. He argues that, at most, the evidence showed that he was present when the cocaine was imported, and that he associated with individuals who broke the law.

■ In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the jury verdict and affirm if a rational trier of fact could have found that the government proved the essential elements of the crime charged beyond a reasonable doubt. *United States v. Webster*, 960 F.2d 1301, 1307–08 (5th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992). With respect to the conspiracy charges, the government was required to prove, with either direct or circumstantial evidence, that: (1) two or more persons agreed to commit a crime, (2) the defendant knew of the conspiracy, (3) the defendant intended to join the conspiracy, and (4) the defendant participated in the conspiracy. *United States v. Abadie*, 879 F.2d 1260, 1265 (5th Cir.), *cert. denied*, 493 U.S. 1005, 110 S.Ct. 569, 107 L.Ed.2d 563 (1989).

The government's case against Ruiz was largely circumstantial, but nevertheless compelling. With respect to the 1987 shipment, Moreno testified that, when he arrived in Jackson, he went to dinner with Nelson Clavijo, Vargas, and Ruiz. While Ruiz was sitting at the table with them, Moreno and Clavijo discussed their plans for unloading the shipment. Moreno testified further that he saw Ruiz at the warehouse cleaning up scrap metal from the false wall in the shipping container. Stephen Giachelli, another of the co-conspirators, testified that he met Ruiz in Miami. Ruiz was introduced as one of Nelson Clavijo's helpers. Giachelli testified that Ruiz came to Jackson with Nelson Clavijo when the first shipment arrived. Giachelli stated that he saw Ruiz and others packing cocaine into cardboard boxes at the warehouse.

Moreno also testified he saw Ruiz cleaning up at the warehouse after the 1988 shipment of cocaine was unpacked. Giachelli testified that Ruiz was in Miami watching the second shipment of cocaine before it was transported to New Orleans and then to Jackson. He testified further that he saw Ruiz helping to dismantle the false walls in the shipping containers, and packing cocaine into boxes.

In addition, Giachelli testified that Ruiz was with Nelson Clavijo in Memphis shortly after the second shipment was unloaded. Clavijo called Giachelli in Jackson and asked Giachelli to come to Memphis, explaining that he, Vargas, and Ruiz had been chased by individuals with guns, but had escaped. Giachelli testified that after he arrived in Memphis and picked up Clavijo, they located Ruiz and Vargas, who were hiding by a garbage dumpster behind a fast food restaurant. They retrieved a satchel of money from the dumpster and Giachelli brought all three men back to Jackson. Giachelli testified that the satchel contained two or three hundred thousand dollars, and that Clavijo gave him a little over a hundred thousand dollars.

Vargas, who was involved only with the 1988 shipment, testified that Ruiz helped load boxes of cocaine from a mini-warehouse into a truck. He also testified that Ruiz was present when he discussed his plans to pack up the cocaine and drive it to Miami; that Ruiz was in the car with Clavijo and followed him to Florida; and that Ruiz helped unload the cocaine at Ivan Clavijo's apartment. In addition, he testified that Ruiz went to Houston with him and Nelson Clavijo, to get money.

Ruiz took the stand and admitted that he was present on each of the occasions described by the government's witnesses, but testified that he unloaded only barbed wire, not cocaine. He testified that he received no money, and was present only to assist his cousin, Nelson Clavijo. Ruiz maintained that he did not know about any cocaine.

Based on this evidence, the jury clearly was entitled—notwithstanding Ruiz's denials—to find that Ruiz knowingly participated in both conspiracies, and that he was in joint possession of the cocaine.

### F

Gonzalez also challenges the sufficiency of the evidence. He was convicted of conspiracy and felony possession with respect to the 1987 shipment, and of interstate travel in aid of racketeering.

### (1)

■ With respect to the conspiracy and felony possession charges, Moreno testified that he met with Montero and Gonzalez in Denver prior to the arrival of the 1987 shipment. Moreno told Montero that a container of cocaine was on its way to the United States, and asked if he wanted to assist in unloading it. Montero agreed to do so, and Moreno gave him $1500 cash for air fare from Denver to Jackson. Gonzalez was present during this discussion. After the shipment arrived in Jackson, Moreno called Montero in Denver. Montero and Gonzalez arrived in Jackson that evening. The next day, Moreno took Montero and Gonzalez to the warehouse. Moreno testified that he told Montero and Gonzalez to make sure that "everything," i.e., the cocaine was inside the container, and to pack everything into boxes and get rid of the evidence, i.e., the false wall in the container. Later, Moreno saw Gonzalez, Ruiz, and Montero cleaning up scrap metal from the false wall. Moreno testified that he, Montero, and Gonzalez returned to the hotel after they finished unpacking the cocaine at the warehouse, and that he paid Montero $20,000 cash for their work.

Stephen Giachelli testified that he saw Gonzalez putting cocaine into boxes at the warehouse. He also testified that Nelson Clavijo asked him to take Montero and Gonzalez to the airport after the shipment was unpacked. The government introduced evidence showing that Giachelli purchased tickets from Jackson to Denver on American Airlines for "Valentin Gonzalez" and "Marisio Gonzalez." Moreno's testimony that Gonzalez and Montero returned to the hotel is somewhat inconsistent with Giachelli's testimony. According to Giachelli, he went to the airport and purchased the tickets, and then returned to the warehouse, picked up Montero and Gonzalez, and took them directly to the airport. Ruiz testified that he did not see Gonzalez at the warehouse.

Gonzalez's argument consists primarily of a challenge to the jury's credibility determinations. As we have repeatedly held, such credibility determinations are within the exclusive province of the jury. *See, e.g., United States v. Lindell,* 881 F.2d 1313, 1322 (5th Cir.1989), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990). Furthermore, we view the evidence in the light most favorable to the jury's verdict. *Id.* We conclude that the evidence was sufficient to support the jury's finding that Gonzalez knowingly participated in the 1987 conspiracy and was in joint possession of the cocaine involved in that conspiracy.

### (2)

■ Gonzalez also contends that the evidence was insufficient to convict him of traveling in interstate commerce in order to aid a drug conspiracy, because he was only involved in the 1987 shipment of cocaine and, thus, he was not involved in a continuous business enterprise. The statute that Gonzalez was convicted of violating defines "unlawful activity" as "any business enterprise involving ... narcotics or controlled substances...." 18 U.S.C. § 1952(b). We have defined a "business enterprise," as it is used in this statute, as "a continuous course of conduct rather than sporadic, casual involvement in a proscribed activity."

*United States v. Cozzetti*, 441 F.2d 344, 349 (5th Cir.1971).

We do not, however, require the government to prove that the defendant personally engaged in a continuous course of conduct. *United States v. Carrion*, 809 F.2d 1120, 1127 (5th Cir.1987). Rather, the government must prove only that there was a continuous business enterprise and that the defendant participated in the enterprise. For instance, in *Carrion*, the government established that the "business enterprise" had made three deliveries of cocaine, and the defendant had helped with one of the deliveries. Upholding the defendant's conviction, we held that the evidence was sufficient, because the government established that the shipment of cocaine that the defendant helped to deliver was part of a continuous business enterprise. *Id.* Here, there were two cocaine shipments, and the jury found that those two shipments constituted a continuous business enterprise. Thus, proof that Gonzalez participated in one of the shipments was sufficient to convict him under the statute.

## IV

For the foregoing reasons, the convictions of Ruiz and Gonzalez are

AFFIRMED.