IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-5673
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALVARO R. LEAL and PEDRO SANCHEZ VARGAS,

Defendants-Appellants.

_____

Appeals from the United States District Court for the
Western District of Texas
_____

(August 16, 1994)

Before GARWOOD, JOLLY, and SMITH, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Leal and Vargas are minority businessmen who made a business loan with the Small Business Administration ("SBA"); they appeal their convictions for crimes alleged to have been committed in respect to their loan. In this connection, Leal and Vargas borrowed over $14 million from the SBA for their oil refinery business under a minority assistance program. To obtain the minority assistance, Leal stated that he was not using consultants when, in fact, he was. Under the loan agreement, the SBA advanced money each month to finance the refinery's purchase of crude oil to be refined by them. The amount of each advance was based on

invoices the SBA received from them.  The invoices were supposed to reflect the amount of crude ordered and received by them for each month.  In fact, based on incorrect invoices furnished by Leal and Vargas, the SBA was advancing funds in excess of the agreed amount. As Leal Petroleum sold the refined product--jet fuel--it was obligated to forward the proceeds to the SBA.  When cash flow became tight, however, Leal and Vargas converted SBA funds by diverting $1.4 million in proceeds, and they were charged with paying part of these funds to themselves, individually, and for their personal use.  At trial, Leal and Vargas were convicted of making false statements and converting SBA funds to their own use. On appeal, we have reviewed the record for sufficiency of the evidence.  We affirm the convictions of Leal, affirm in part and reverse in part the convictions of Vargas, and remand for resentencing of Vargas.

I

The Small Business Administration ("SBA") operates a program, known as the "8(A) program," which is designed to assist socially and economically disadvantaged entrepreneurs in getting into mainstream American business by giving them the opportunity to sell goods and services to the federal government.  In order to be involved in the 8(A) program, participants must be socially and economically disadvantaged; own fifty-one percent of the participating business; manage the business on a daily basis; demonstrate a potential for success; and have a product or service

that is purchased by the federal government.  If accepted into the 8(A) program, participants get the benefit of "noncompetitive procurements from the federal government."

Alvaro Leal and Pedro Vargas, as stockholders of Leal Petroleum Company ("LPC"), participated in the SBA's 8(A) program, contracting to supply jet aircraft fuel to the Defense Fuel Supply Center ("DFSC").[1]  As part of this arrangement, the SBA and Leal agreed to an "advance payment"[2] contract, in which the SBA agreed to provide fourteen million dollars in financing to assist in LPC's performance under the DFSC jet fuel contract.[3]  As required by SBA regulations, the total amount required to fund the purchase of crude oil for the government's portion of the contract was set aside.

The advance payments were made through an account held jointly by the SBA and LPC.  When LPC wanted to use the funds for crude oil purchases, LPC would obtain preliminary invoices from its crude oil

---

[1]In March 1986, the DFSC awarded a minority set-aside contract to produce 42 million barrels of jet fuel to the SBA. In turn, the SBA subcontracted that contract to LPC on March 27, 1987.

[2]Advance payments are those made by the SBA to LPC prior to LPC's purchase of crude oil for refinement.

[3]Under the contract, the SBA would fund sixty-eight percent of LPC's crude purchases.  Sixty-eight percent corresponds to the amount of each barrel of crude oil that would be converted into jet fuel and then delivered to the DFSC.  The remainder of the crude produced other by-products that LPC sold in the private market.  The SBA would not fund LPC's operations that fell outside the scope of the DFSC contract.

supplier--Tesoro Crude Oil Corporation ("Tesoro")--for the amount of crude to be shipped in the next month. Based on the preliminary invoices, LPC would prepare a "certification letter" for the SBA, stating the amount needed for the next month's crude oil purchases. When the SBA had approved the advance payment for the percentage amount that the SBA would finance, the SBA and Leal would both sign a check to transfer money from the joint bank account to a special lock-box account controlled by Tesoro.[4] In this way, Tesoro insured that it would be paid for the next month's crude delivery. The crude oil purchase being then complete, LPC was to receive the crude and then refine it into jet fuel for delivery to the DFSC. All payments received from the DFSC for jet fuel deliveries were deposited back in the joint account,[5] and LPC agreed to "liquidate" all such proceeds into a cashiers check for payment to the SBA.

After this advance payment system was in operation, however, LPC began experiencing cash shortages because of dropping oil prices. When confronted with this problem by LPC's comptroller, Leal stated that he had a "method" of diverting money from crude oil purchases to fund operations. At trial, the government contended that the "method" consisted of LPC's submitting

---

[4]As previously noted, the SBA was to pay on sixty-eight percent of each barrel purchased in order that the SBA would not fund LPC's nongovernment business.

[5]The SBA filed a Form UCC-1 to perfect its security interest in the money in the joint account and the proceeds received into the account from the DFSC.

certification letters to the SBA--based on preliminary invoices to LPC from Tesoro--and then LPC's refusing to accept delivery of some of the crude oil when Tesoro, in accord with the preliminary invoice, shipped it to LPC. Thus, the SBA, funding monies to LPC on the basis of the invoices, would have funded more fuel oil than was actually accepted and paid for by LPC. In the next month, LPC was then able to use these excess SBA funds for operations and crude purchases outside of the DFSC contract, in violation of the advance payment contract.

Cash flow degenerated further in March 1987 after the SBA stated that it would not renew the advance payment loan for another year. At that point, the DFSC paid approximately $1.4 million to LPC for previous delivery of jet fuel, which sum was deposited into the joint account. Under the contract, Leal was supposed to purchase with these funds a cashier's check payable to the SBA. Instead, Leal deposited the $1.4 million into LPC's operating account. Most of this $1.4 million, in the absence of the previous advance payment arrangement with the SBA, went to pay for the next month's crude. Leal and Vargas, however, took part of this money-- $300,000 and $55,000, respectively--for their personal use. Because LPC had used the $1.4 million for operating expenses, it could not make a scheduled payment to the SBA. When LPC defaulted, the SBA investigated and criminal charges followed.

In addition to the charges that resulted from LPC's misappropriation of SBA funds, Leal was also charged with making

false statements to the government about LPC's use of consultants and about a contingent liability for future royalties to be paid the undisclosed consultants. The facts that are relevant to those charges are as follows: As a condition to the advance payment contract, LPC agreed not to employ consultants while advance payments were outstanding and to disclose any contingent liabilities. Leal, however, had previously used consultants to obtain the DFSC contract and had agreed to pay them a fixed fee and royalty payments for every barrel of jet fuel. Leal did not disclose a contingent liability for future royalties to be paid the undisclosed consultants. In fact, Leal set up a shell corporation, San Antonio Fuels ("SAF Oil") in order to pay a consultant--through SAF Oil--without alerting the auditors that LPC was paying consultants.

II

On April 15, 1992, the grand jury indicted Leal and Vargas. Leal and Vargas were charged with conspiring to defraud the SBA in violation of 18 U.S.C. § 371 and conversion of SBA funds for personal use in violation of 15 U.S.C. § 645(c). Additionally, Leal and Vargas were charged with several counts of making false statements to the government in violation of 18 U.S.C. § 371.

The jury rendered the following verdicts:

| COUNT | DESCRIPTION | VERDICT | |
| --- | --- | --- | --- |
| | | Leal | Vargas |
| 1 | § 371-Conspiracy to Defraud the SBA | Not Guilty | |

2        § 645(c)-Conversion of SBA Funds            Guilty

| COUNT | DESCRIPTION | VERDICT | |
|---|---|---|---|
| | | Leal | Vargas |
| 3 | § 1001-False Statement--9/5/86 Letter re: $2.7 million in costs | Not Guilty | |
| 4 | § 1001-False Statement--9/24/86 Letter re: $1.1 million in costs | Not Guilty | |
| 5 | § 1001-False Statement--10/16/86 Letter re: $1.4 million in costs | Guilty | |
| 6 | § 1001-False Statement--12/5/86 Letter re: $2.9 million in costs | Guilty | |
| 7 | § 1001-False Statement--1/12/87 Letter re: $2.3 million in costs | | Guilty |
| 8 | § 1001-False Statement--7/30/86 Letter re: consultants' employment | Guilty | N/A |
| 9 | § 1001-False Statement--7/31/86 Contract re: contingent liability | Guilty | N/A |

The district court sentenced Leal to a total of seven years imprisonment, five years of probation and over $4 million in restitution. The district court sentenced Vargas to four years imprisonment, five years of probation and approximately $4.9 million in restitution.

### III

On appeal, Leal and Vargas argue (1) that the evidence was insufficient to support each of their convictions for conversion of SBA funds to personal use; (2) that the evidence was insufficient to support each of their convictions for making false statements; and (3) that the district court erred in limiting each defense attorney to 22 minutes for closing argument. Finding that the evidence was sufficient to support all of the jury's convictions

against Leal, we affirm Leal's convictions and sentence.  Further, we affirm the district court's conviction of Vargas for conversion of funds, but we find insufficient evidence to support the false statement convictions of Vargas.  We therefore reverse and vacate the convictions of Vargas on counts five, six, and seven, and we remand this case to the district court for resentencing.  Finally, we hold that the district court committed no error with respect to closing argument.

A

The appellant's first challenge to the sufficiency of the evidence concerns their convictions under 15 U.S.C. § 645 for conversion of SBA funds to personal use.  Section 645(c) imposes criminal sanctions on "[w]hoever, with intent to defraud, knowingly conceals, removes, disposes of, or converts to his own use or to that of another, any property mortgaged or pledged to, or held by, the [SBA] . . . ."  15 U.S.C. § 645.  In reviewing challenges to sufficiency of the evidence, this court views the evidence in the light most favorable to the jury verdict and affirms if a rational trier of fact could have found that the government proved all essential elements of the crime beyond a reasonable doubt.  United States v. Ruiz, 987 F.2d 243, 249 (5th Cir.), cert. denied, 114 S.Ct. 163; 126 L.Ed.2d 123 (1993).  All credibility determinations and reasonable inferences are to be resolved in favor of the jury's verdict.  See id.

By the terms of the agreement between the SBA and LPC, all money that LPC received from DFSC for jet fuel sales was deposited directly into the joint account held by the SBA and LPC. Leal was then required by the terms of the agreement--terms about which there is no dispute or misunderstanding alleged--to use one hundred percent of these sales proceeds to repay the SBA loan. The method established to accomplish this repayment required Leal to purchase a cashier's check and thereby to deliver the proceeds to the SBA. On the occasion in question, however, Leal instead withdrew $1.4 million from the joint account and deposited these monies into LPC's operating account. On the same day that the money was deposited into the operating account, Leal withdrew $300,000 and Vargas withdrew $55,000 for their personal use. These are the acts that formed the basis for their conviction under 15 U.S.C. § 645 for conversion of SBA funds to personal use.

(1)

In arguing whether these acts amounted to conversion, both parties have focused their discussion on whether the SBA had a properly perfected security interest and/or a valid lien in the jet fuel proceeds that were deposited in the joint account. We need not determine, however, whether the SBA had a perfected security interest in these monies in order to uphold a conviction under 15 U.S.C. § 645 as it relates in this case to Leal and Vargas. Section 645 requires only that the property be "pledged" to the SBA, and there is no indication that "pledged" must be given a

meaning restricted to its most narrow and legalistic definition on the basis of state law.

Although we are not faced with deciding the absolute minimum criterion of what formalities are required to constitute pledged property under 15 U.S.C. 645, we hold in this case that, as between the defendants and the SBA, jet fuel sales proceeds were "pledged" to the SBA sufficient to satisfy the crime Congress intended to reach under this statute. Pursuant to the loan agreement, Leal and Vargas agreed to <u>segregate</u> these funds by placing them into a designated account. They agreed that SBA had an <u>ownership</u> claim to one hundred percent of these proceeds. And they agreed that the <u>purpose</u> of these funds was solely to repay their indebtedness to the SBA. Clearly these funds were pledged to the SBA by the unequivocal and binding promises in the loan agreement.

Furthermore, Leal and Vargas knew that this money was pledged to the SBA, that they had no legal or other claim to these funds, and, to the extent that they exercised possessory control over these funds, they knew that the loan agreement permitted only one disposition of the funds: deliver them to the SBA. In short, these funds were contractually pledged to the SBA in a manner sufficient to support a conviction under 15 U.S.C. § 645. See <u>United States v. Bellman</u>, 741 F.2d 1116, 1118 (8th Cir. 1984).

(2)

Second, Vargas argues that because he was acquitted on the conspiracy charge, there is not enough evidence to show that he

-11-

participated with Leal in converting the SBA funds. On the contrary, the evidence shows that Vargas was a CPA, owned a substantial minority interest in LPC, and was substantially involved in the day-to-day operations of the refinery. Vargas had expertise in the financial matters of LPC. Further, Vargas argued vehemently with Leal in an effort to keep Leal from depositing the pledged funds into LPC's operating account, which showed that both men knew the funds had to be paid over to the SBA. Yet, when the sales proceeds were deposited into LPC's operating account, Vargas did not quit his job or otherwise disassociate himself from the act. Instead, he withdrew $55,000 from the operating account for his personal use--on the very day that the pledged funds were deposited into the operating account.

(3)

Vargas also argues that he did not convert SBA funds for personal use, but rather that he merely took a $55,000 loan from the refinery's operating cash. He argues that because the operating account had more than $138,000 in funds from sources other than the SBA--Leal Petroleum's private market business--Vargas's $55,000 loan simply did not involve the SBA's funds.

We conclude, however, that the evidence was sufficient for the jury to infer that Vargas did convert the SBA's funds for personal use. Vargas withdrew the $55,000 immediately after the $1.4 million of SBA funds were deposited into LPC's operating account. The jury could easily infer that Vargas's withdrawal came from the

$1.4 million of SBA funds, which comprised approximately 96.5% of the operating account balance, instead of the $138,033 of non-SBA funds, which comprised approximately 3.5% of the operating account balance. With the company strapped for cash and with notice that the advance payment loan would not be renewed, the jury could easily infer that Leal and Vargas were trying to line their pockets with funds they knew were pledged to the SBA before LPC became insolvent.

(4)

In sum, with respect to the conversion count, the evidence is clearly sufficient to support the conclusion that jet fuel sales proceeds had been pledged, under the loan agreement, to the SBA. The evidence further supports the jury's finding that when Leal deposited such proceeds in LPC's operating account, and that when Leal and Vargas withdrew part of that money from LPC's operating account, they knowingly converted SBA money to their "own use or to that of another." 15 U.S.C. § 645. Thus, we affirm the section 645 convictions of Leal and Vargas.

The appellants second challenge to the sufficiency of the evidence concerns their convictions under 18 U.S.C. § 1001 for making false statements. Section 1001 imposes criminal penalties on:

> Whoever, in any matter within the jurisdiction of any department or <u>agency of the United States</u> knowingly and willfully falsifies, <u>conceals</u> or covers up by any trick, scheme, or device a <u>material fact</u>, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry . . . .

18 U.S.C. § 1001 (emphasis added). The elements of a § 1001 offense are: (1) a statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction. <u>United States v. Baker</u>, 626 F.2d 512, 514 (5th Cir. 1980). Again, with respect to sufficiency of the evidence challenges, this court views the evidence in the light most favorable to the jury verdict and affirms if a rational trier of fact could have found that the government proved all essential elements of the crime beyond a reasonable doubt. <u>Ruiz</u>, 987 F.2d at 249.

(1)

First, Leal argues that the evidence was insufficient to prove that the SBA was an "agency of the United States." The evidence on this point, however, was not insufficient. Alexander, the SBA's assistant regional administrator, testified as follows:

Question: "SBA is a government agency, right?"

Alexander: "That is correct."

Second, Leal argues that the evidence did not establish that he made any "false statements."  With respect to the alleged false statements in counts five, six, and seven--the certification letters based on the preliminary invoices and each signed by Leal--Leal asserts that he did not <u>knowingly</u> make false statements because his applications for advance payments were based on good faith estimates at the time they were made.  <u>See</u> <u>United States v. Race</u>, 632 F.2d 1114 (4th Cir. 1980).  The amount of each certification letter was computed by calculating the amount of crude oil necessary to refine enough jet fuel to fill the DFSC's order for the next month.  Thus, he argues that the estimates he furnished to the SBA were reasonable when made.  Further, Leal points out that when LPC actually processed less crude oil than ordered, it adjusted its next month's order of crude.

Viewing the evidence in the light most favorable to the jury verdict, however, we find that a rational trier of fact could have found beyond a reasonable doubt that Leal was guilty under counts five through seven, which relate to the certification letters. Leal signed and submitted <u>numerous</u> monthly "preliminary invoices" that listed higher amounts of crude than the refinery actually received--LPC refused crude deliveries without informing the SBA over 100 times in a three- to six-month period.[6]  Further, Leal

---

[6]Although the jury acquitted Leal and Vargas of the first two false statement-certification letter charges, it apparently

told Perrin, a consultant and LPC's comptroller, not to worry about a shortage of operating cash because he had a "method" of diverting money for crude oil to cover operating costs. This "method" was the intentional overinflation of the preliminary invoices and the intentional failure to make adjustments or to inform the SBA when the represented amount of crude was not purchased. This inflation resulted in over $3 million in excess payments from the SBA to LPC, which were then used for purposes not included in the loan agreement. The jury verdicts of Leal's guilt of these false statement counts are supported by the evidence.

(2)

With respect to Vargas, however, we find that the evidence was not sufficient to support his convictions under § 1001. Counts five, six, and seven of the indictment, setting out specific dates, charged that

> On or about October 16, 1986, [December 5, 1986, and January 12, 1987] . . . Pedro Sanchez Vargas, knowingly and willfully made or caused to be made . . . false and fraudulent statement[s] and representation[s] as to a material fact . . . in that [Vargas] submitted and caused to be submitted to the S.B.A. [three specific letters] certifying that [certain amounts were] a cost incurred in performance of the S.B.A. contract for the purchase of crude oil from Tesoro Crude when in truth and in fact, as [Vargas] well knew, [those] amount[s were] significantly overstated, all in violation of Title 18, United States Code, Section 1001.

(Emphasis added). The evidence showed that Vargas did not sign any of the certification letters (the advance payment requests) that

refused to excuse the repeated pattern of overestimation.

-16-

were submitted to the SBA by LPC. Further, the evidence did not establish that Vargas was involved in the preparation of the letters listed in the indictment or in the delivery of such letters on the specific dates listed in the indictment. Accordingly, we hold that the government failed to prove beyond a reasonable doubt that Vargas committed the crimes with which he was charged in counts five, six, and seven of the indictment,[7] and we reverse the contrary judgment of the district court.

(3)

Third, with respect to count eight, which dealt with the hiring of consultants, Leal argues again that he did not _knowingly_ make any false statements. The indictment charged that Leal made a false statement in a letter to the SBA when he stated that "[c]onsultants _will not_ be employed without prior approval of the SBA." (Emphasis added). Leal argues that this statement was true, because at the time he signed the letter, the consulting fees had already vested. Further, in a prior letter, Leal stated that

---

[7]The record will support a finding that Vargas caused to be made various false statements over the course of the SBA contract in that the evidence showed that Vargas did deliver advance payment requests packets to the SBA on several occasions. These occasions, however, are unspecified in the record by date or other detail. Further, the evidence will support a finding that Vargas "concealed" "material fact[s]" from the SBA by not revealing to the SBA that they were continually overfunding LPC's crude purchases. The indictment, however, charged Vargas not with concealment or generally with making false statements over a period of time, but with making specific false statements designated by specific dates in specific letters. As we have noted, there is no evidence in the record that connects Vargas to the false statements alleged in the indictment.

-17-

"effective the date of the advance payment, LPC will obtain prior SBA approval from the District Office for all consultant agreements."  He contends that the most reasonable construction of the "consultant" language was that LPC would obtain prior approval for _future_ employment of consultants.  He argues, thus, that he did not make a "false statement" as a matter of law.  See Race, 632 F.2d at 1120.  Finally, Leal argues that his statements were _literally_ true because he only employed consultant Besinaiz to obtain the DFSC contract, which was obtained months prior to Leal's letter of intent.  Thus, although the payments to Besinaiz continued after Leal's statement, Besinaiz's services ended prior to the statement.

The evidence is clear, however, that Leal intended to mislead the SBA by assuring them that he would not employ consultants. Leal signed several agreements--the Participation Agreement, Solicitation, and Contract--that required him to _disclose_ the payment of consulting fees.  It was made clear to Leal that the SBA wanted to make sure that the minority assistance was assisting minority business only.  Yet, he used consultants to obtain the DFSC contract, and he continued to pay them royalties, from the DFSC contract, after the SBA papers were signed.  And instead of disclosing the payment of consulting fees as he was required to do, he assured the SBA that he would not employ consultants. Furthermore, Leal set up a shell corporation in order to pay a consultant in a manner that the auditors could not discover.  Thus,

-18-

the jury is supported in finding that Leal made a false and fraudulent representation by assuring the SBA that he would not employ any consultants while at the same time remaining silent about the consultant he was continuing to pay. See United States v. Mattox, 689 F.2d 531, 533 (5th Cir. 1982) ("Silence may be falsity when it misleads, particularly if there is a duty to speak.").

(4)

Finally, with respect to count nine, Leal argues that he did not make a false statement when he said that he had "disclosed all contingent liabilities" because he was not required to disclose the consulting fees as a "contingent" liability. He contends that in July 1986, when the DFSC contract was executed, the fees became a fixed liability. The liability, however, for the royalty payments to the consultants was contingent in the sense that it was only triggered when the jet fuel was actually delivered. See AICPA Technical Practice Aid, Update No. 93.03 (1991) (stating that royalties for to-be-mined coal are contingent liabilities); see also Black's Law Dictionary 321 (A contingent liability is a liability that "is not now fixed and absolute, but which will become so in case of the occurrence of some future and uncertain event.") Because the payment of royalties based on to-be-delivered jet fuel constitutes a contingent liability as a matter of law, and in the light of the relevant evidence as a whole, the jury was clearly supported in finding that Leal meant to convey a falsity

when he asserted that he had "disclosed all contingent liabilities." In sum, we find that the evidence is sufficient to support Leal's convictions under counts eight and nine of the indictment, and we affirm the district court in that respect.

C

The appellants last argue that they are at least entitled to a new trial because the district court erred in limiting each defense attorney to 22 minutes for closing argument. We review a district court's determination of how much time to provide to defense counsel for closing argument for an abuse of discretion. United States v. Bernes, 602 F.2d 716, 722 (5th Cir. 1979).

We conclude that the district court did not abuse its discretion in limiting the total closing argument time for both defendants to 45 minutes. The district judge listened to both sides before deciding how much time to allot. The district court decided, based on all the facts and circumstances, that 45 minutes total was sufficient. As the government points out, the defense was basically that there was a lack of intent, which did not require an elaborate presentation. Thus, we cannot say that the district court's decision was unreasonable. Further, neither defense counsel requested more time at the termination of their closing argument. See Bernes, 602 F.2d at 722 (refusing to reverse for allotting too little time for closing argument, and noting that defense counsel did not request more time at the end of his closing

argument).  Thus, we hold that the district court committed no reversible error in this respect.

IV

In conclusion, we hold that the evidence is sufficient to uphold the conviction for conversion against both Leal and Vargas. The evidence further supports all false statement counts against Leal.  The evidence is insufficient, however, to support Vargas's convictions for making false statements.  We therefore REVERSE and VACATE the convictions of Vargas on counts five, six, and seven, and we REMAND this case to the district court for resentencing. And, finally, we have held that the district court did not abuse its discretion in limiting the defendants' closing argument time. Accordingly, the judgment of the district court is

AFFIRMED in part and REVERSED and VACATED in part,
and REMANDED for resentencing of Vargas.