UNITED STATES of America,
Plaintiff–Appellee,

v.

Shandra Leilani GRAY, also known as Sue Steiner; Michael Eric Satz, also known as Mike Stax, also known as Mike Samuelson, also known as Mike Stewart, also known as Mike Stevenson, also known as Bruce Sheridan; Scott Andrew Luchkowec, also known as Scott Johnson, Defendants–Appellants.

No. 95–10405.

United States Court of Appeals,
Fifth Circuit.

Jan. 29, 1997.

Phillip C. Umphres, Dept. of Justice, U.S. Attorney, Dallas, TX, for U.S.

Gerhard Ernst Kleinschmidt, Fort Worth, TX, for Gray.

Before JONES, DUHÉ and EMILIO M. GARZA, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellants Michael Eric Satz, Shandra Leilani Gray, and Scott Andrew Luchkowec were tried in federal district court and found guilty, after a jury trial, of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and multiple counts of mail fraud, in violation of 18 U.S.C. § 1341. The court sentenced Satz to 108 months in prison, Gray to 41 months, and Luchkowec to 46 months. The defendants appeal their convictions, raising as their most significant issue whether the trial court's stringent enforcement of rules of courtroom efficiency prejudiced them and hobbled the presentation of their defense. Finding no reversible error on these and their other points, we affirm.

## I. BACKGROUND

This case arose from a telemarketing scheme involving a "loan broker" called Financial Plus, which did business in Arlington, Texas from November through mid-December, 1991. Financial Plus advertisements in newspapers and periodicals throughout the country promised to provide loans within twenty four hours, regardless of a borrower's credit problems. Prospects who dialed the noted 1(800) phone number spoke to a Financial Plus telemarketer. The callers were asked basic questions about their credit history and financial status and the size of the loan they wanted. The callers were told that Financial Plus was a loan broker, that a credit check would be run to see if they qualified for a loan program, and that they would be contacted if they were qualified.

But without performing any sort of credit check, the Financial Plus telemarketers faxed the names and phone numbers of the callers to its operation in Atlanta, Georgia that used the name Citizens Capital, and to a location near Miami, Florida called Sheridan Financial. Employees at these locations then called the names on the lists, again without doing any sort of credit check or investigation, and informed the prospective "borrowers" that they had been approved or preapproved for a loan, and that they should recontact Financial Plus to complete arrangements for a loan.

The catch was that the prospective borrowers were told that they had to send a money order for $299 to Financial Plus by overnight mail as a processing fee or as an advance payment. Financial Plus employees then forwarded the money sent in by those callers who had succumbed to the ruse to Ubol Satz, the wife of defendant Satz. The victims were then sent a loan application, which they were required to fill out and send back to the designated "lender," either Citizens Capital or Sheridan Financial. These offices held the applications for anywhere from fourteen to twenty-one days, following

which the borrower's application would invariably be denied, frequently based upon some alleged discrepancy or technical defect in their execution of the application.[1]

Victims who complained or sought refunds were subjected to various stalling tactics. Refunds were rare and given only to victims who seemed to pose a threat of trouble, such as the prospect of bringing the operation to the attention of law enforcement officials.

Michael Eric Satz ("Satz") organized and oversaw the operations of Financial Plus as well as a similar Dallas operation called American Financial. Satz also started and oversaw an "advance fee" operation in Aurora, Colorado called First Financial Corp. Financial Plus and American Financial used Citizens Capital and Sheridan Financial, which Satz had also created and supervised, as purported lenders. Satz leased office space for these businesses, hired and trained the initial employees, and provided the paperwork given to the victims. Satz received half or more of the $299 advance fee paid by the victims and called the Texas operations almost daily. When the Texas advance fee telemarketing locations were shut down and searched by law enforcement officials, Satz cut off contact with them and told the manager of Sheridan Financial to close and get rid of the loan applications.

Shandra Leilani Gray ("Gray") was initially hired to work for American Financial answering the phone, faxing the lists of names and phone numbers to the purported lender, handling complaints, and talking customers out of demanding refunds. When Satz opened Financial Plus, he transferred Shandra Gray over to manage the office. She served as manager for a little over a month, from mid-November until Financial Plus was searched by police on December 18, 1991.

Scott Andrew Luchkowec ("Luchkowec") was originally hired at U.S. Funding, the purported lender for Satz's Colorado-based loan brokerage operation. When Satz closed U.S. Funding, he made Luchkowec the man-

---

**1.** Out of hundreds of applications filled out, the evidence from the trial revealed that only one small loan of $1000 was ever actually extended. The evidence surrounding the issuance of this loan, including the fact that the payment coupons were apparently a make-shift job, out of order and held together by duct tape, indicated it was issued so that defendants could deny that prospective borrowers never received loans.

ager of Citizens Capital, the storefront lender for Financial Plus. Luchkowec managed the fake lending office and hired its employees.

Victims of the telemarket scheme and co-employees of Gray and Luchkowec, as well as Satz's former wife Ubol, testified for the government about the fraudulent scheme. On appeal, the defendants contend that the court interrupted their presentation of evidence and actively assisted the prosecution; that insufficient evidence exists to convict Satz and Gray; that appellants' sentences were miscalculated; and that *Brady* and jury instruction errors occurred.

## II. DISCUSSION

### A. The Defendants' Fifth Amendment rights to a fair trial.

Common to all three appellants is the contention that the actions of the district court judge (the Hon. John H. McBryde) during the course of the proceedings deprived them of their Fifth Amendment rights to a fair trial. They allege that the judge made improper remarks during voir dire, unfairly limited the time for opening and closing arguments and arbitrarily restricted the number of character witnesses. Additionally, the appellants contend that the judge abandoned his neutral role during trial and identified himself through his actions with the prosecution. We examine each of these allegations in turn.

#### 1. Voir dire

■ Gray and Luchkowec challenge the manner in which the trial court conducted the voir dire examination of the prospective jurors. The trial court, they assert, favored the prosecution by essentially arguing the prosecution's case before the prospective jurors, and placed undue restrictions on voir dire. Ordinarily, a trial court has broad discretion in conducting voir dire; its actions are not subject to reversal absent a clear abuse of discretion. *United States v. Shannon*, 21 F.3d 77, 82 (5th Cir.1994), *cert. denied*, — U.S. ——, 115 S.Ct. 260, 130 L.Ed.2d 180 (1994). In determining whether to uphold the trial court's conduct during voir dire, the question is whether the overall conduct protected the appellants' rights. *United States v. Armendariz–Mata*, 949 F.2d 151, 156 (5th Cir.1991), *cert. denied*, 504 U.S. 945, 112 S.Ct. 2288, 119 L.Ed.2d 212 (1992).

■ The district court summarized the allegations set forth in the indictment, but he expressly stated that these allegations were not fact and that the government bore the burden of proof. A simple recitation of the charges, combined with an admonition regarding the ultimate burden of proof at trial, does not rise to the level of partiality to the prosecution. The trial court restricted the attorneys on both sides to five minutes each of additional voir dire and required challenges following voir dire to be made in ten minutes. But aside from correcting the trial court after he misstated the amount of the advance fee sought by Financial Plus from customers, the defendants did not otherwise challenge the district court's actions during voir dire or the time allotted for exercising challenges. A criminal defendant's failure to object to error results in waiver absent a showing of "plain error" on review. Fed. R.Crim.P. 52(b). The district court did not commit plain error, and appellants' rights were protected during voir dire.

#### 2. Opening Statements and Closing Arguments

Satz and Gray contend that the district court set unreasonably short time limits for opening statements and closing arguments. Immediately prior to opening statements, the court informed all of the parties that the prosecution would have five minutes for opening statements and the defendants would each have three minutes. The government made a request for more time, which was denied, but the defendants failed to object to the time limitation. For closing arguments, the trial court initially indicated it would allot the prosecution fifteen minutes and the defense a total of thirty minutes, to be divided equally three ways unless appellants agreed to a different division. Gray alone requested more time for her closing argument at this point, asking for a total of twenty minutes based solely on the rationale that she was "named in a great many

counts." Later, Gray, jointed by Satz, requested the court to reconsider the time limits for the closing arguments. The trial court chose, the next day, to allow each defendant an additional three minutes. In the end, each defendant had thirteen minutes for closing argument.

■■■ The crucial question in reviewing the trial court's time limitations is whether the defendants' counsel were permitted to advocate effectively for their clients. One factor we consider in making this determination is whether the court's restrictions hamper the jury's ability to understand the information and issues at trial. In *Sims v. ANR Freight System, Inc.,* 77 F.3d 846 (5th Cir. 1996), another case involving Judge McBryde's strict time limitations, this court stated:

> When the manner of the presentation of information to a jury is judicially restricted to the extent that the information becomes incomprehensible then the essence of the trial itself has been destroyed.

*Id.* at 849. In the instant case, however, we note that the subject matter was not terribly complex; the only real issue facing the jury was whether the defendants had the requisite intent to defraud. *See, e.g., United States v. Leal,* 30 F.3d 577, 586 (5th Cir.1994) (noting, in response to the assertion that the defendants were denied enough time for closing argument, that the defense of lack of intent "did not require an elaborate presentation"), *cert. denied,* —— U.S. ——, 115 S.Ct. 1172, 130 L.Ed.2d 1126 (1995). The evidence was easy to comprehend; the jurors were presented with relatively clear testimony and simple documents.

In *Grey v. First Nat'l Bank,* 393 F.2d 371 (5th Cir.1968), *cert. denied,* 393 U.S. 961, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968), this court stated that the amount of time allowed for opening statements and closing arguments "is a question so clearly committed to the discretion of the trial judge that we would intervene only where there is an egregious abuse of that discretion." *Id.* at 386. Of course, in the instant case, the defendants failed to object to the court's time limits, leaving them the difficult task of showing "plain error" on review. Fed.R.Crim.P.

52(b). We do not find plain error in the trial court's limitations on opening and closing arguments.

3. Restrictions on the number of character witnesses.

■■■ The district court announced at the commencement of trial that each defendant would be limited to no more than two character witnesses. No one objected. On appeal, however, Luchkowec argues that the court in effect acted as an advocate for the government. The Supreme Court has stated that "rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on [the decision to limit character witnesses]." *Michelson v. United States,* 335 U.S. 469, 480, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948). This court has repeatedly allowed a maximum of three character witnesses. *See, e.g., United States v. Gray,* 507 F.2d 1013, 1015–16 (5th Cir.1975), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *United States v. Squella-Avendano,* 478 F.2d 433, 438 (5th Cir.1973). In *United States v. Henry,* 560 F.2d 963, 965 (9th Cir.1977), the Ninth Circuit found that the district court did not abuse its discretion in limiting a defendant to two character witnesses. Again, Luchkowec failed to object, and his contention is thus subject to the rigorous "plain error" standard of review. Fed.R.Crim.P. 52(b). The trial court gave Luchkowec ample notice that he would be limited to two character witnesses. Additionally, the prosecution asked few questions of the character witnesses and presented no rebuttal character evidence. Luchkowec cannot show that that district court committed plain error.

4. The district court's conduct during trial.

The district court questioned the appellants and various witnesses on direct and cross examination, eliciting information potentially damaging to the appellants' defense, and he frequently interrupted the defense testimony and questioning with admonitions not to waste time, to leave various issues for final argument, and to avoid repetition. The court strictly curtailed questioning on cross

examination that appeared to go outside the scope of the direct examination, and he ordered Satz' counsel during cross examination to sit down before his time was finished. The appellants argue that this behavior, taken in the aggregate, prevented them from adequately developing their defense and gave the jury the impression that the judge was an advocate for the prosecution.

In *Sims v. ANR Freight System, Inc.*, 77 F.3d 846 (5th Cir.1996), this court observed that "a district judge has broad discretion in managing his docket, including trial procedure and the conduct of trial." *Id.* at 849. This discretion extends to commenting on the evidence, questioning witnesses to clarify facts or even elicit facts not yet presented, and moving along the trial by means of interruptions and the imposition of time limits on counsel. *Id.* In reviewing a district judge's trial procedure and conduct of the trial, we ordinarily determine whether the cumulative effect of the judge's actions amount to an abuse of discretion. *Id.* As for the appellants' charge that the district court violated due process by wearing the mantle of a prosecutor, a due process violation occurs "only if the judge so favors the prosecution that he appears to predispose the jury toward a finding of guilt or to take over the prosecutorial role." *Derden v. McNeel,* 978 F.2d 1453, 1459 (5th Cir.1992), *cert. denied,* 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993). But because appellants never objected to the court's actions during trial, our appellate review is confined to the plain error standard.

Notwithstanding the severe constraints on appellants' potential success from the standard of review, we have carefully considered the record of trial. Having done so, we find it fair to say that the district court's actions are characterized not by partiality for the prosecution, but by antipathy to wasted trial time.

It is true that the district court maintained strict rules regarding the introduction of evidence and interrogation of witnesses. But the trial court imposed these requirements with equal diligence on the government. The court interrupted the government during voir dire and the opening statement and chastised the government for repetitive questioning and for improperly asking a witness to interpret a document. The trial court peppered the prosecution with admonitions to move the trial along and to avoid arguing with witnesses, and he made unsolicited objections when the government questioned a witness outside the scope of direct examination. Additionally, the trial court asked clarifying questions during the prosecution's questioning of witnesses; would not the allow the government to present testimony from out-of-town witnesses who had arrived after the time set by the court for having all witnesses present to be sworn in; and twice told the prosecutors to sit down after they continued in repetitive questioning.

In *United States v. Mizell,* 88 F.3d 288 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 620, 136 L.Ed.2d 543 (1996), a case that also involved the complaint that Judge McBryde's active participation in and strict control of direct and cross examinations had created the appearance that the court sided with the prosecution, we concluded that the court's actions, in constantly interrupting both prosecutors and defense attorneys, "were within [the court's] broad discretion to manage the pace and objectivity of the trial." *Id.* at 296. The district court did not take over the prosecutorial role, and his actions would not predispose a jury toward a finding of guilt. From the record, it is clear that the district court put the prosecution and defense on a level playing field. The remaining question is whether the district court, however neutral, provided the defendants with a fair trial.

It is apparent from the record that the district court's questions and admonitions, particularly on cross examination, sometimes broke the flow of the defense presentation. Appellants' counsel may not always have been able to draw out facts or to emphasize the facts in the manner they wished. Even if the plain error standard did not apply, however, we would reverse the trial court's rulings only for a clear abuse of discretion. *See, e.g., United States v. Bryant,* 991 F.2d 171, 175 (5th Cir.1993). Trial judges retain wide latitude to impose reasonable limits on questioning "based on

concerns about ... harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). The confrontation clause of the Constitution guarantees an opportunity for effective cross-examination, but not in whatever way or to whatever extent the defendant wishes. *Id.* In order to obtain relief, the defendant must show that the trial court's restriction of the questioning of witnesses is "clearly prejudicial," based on the overall strength of the prosecution's case, the circumstances surrounding the challenged testimony, the importance of that testimony, and its corroboration or contradiction elsewhere at trial. *United States v. Cooks,* 52 F.3d 101, 104 (5th Cir.1995).

We are convinced, having read the record, that notwithstanding a tendency to push the case along with a heavy hand, the district court conducted a fair trial. The relevant facts were brought to the jury's attention, and the defendants' counsel were able to interpret the facts favorably to their clients during closing argument. Furthermore, when the defendants' counsel were prevented from pursuing a line of questioning, in all but a few cases, they waived error by failing to make a record and explain what they wanted to pursue through their questioning. A defendant must demonstrate that the substance of the excluded argument was made known to the court by an offer of proof or was apparent from the context, or else the error is waived. *United States v. Harrelson,* 754 F.2d 1153, 1179 (5th Cir.1985), *cert. denied,* 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985). Appellants' only recourse on appeal is to demonstrate plain error. *United States v. Gollott,* 939 F.2d 255, 259 (5th Cir. 1991). Importantly, appellants have pointed to no precise information that they were unable to provide the jury because of the judge's involvement. The trial court's rulings and conduct of the proceedings failed to meet either the standard of clear abuse of discretion or plain error.

### B. Sufficiency of the Evidence as to Defendants Satz and Gray

The standard for reviewing the sufficiency of the government's evidence is whether a rational trier of fact could have found the appellants guilty of their charged offenses beyond a reasonable doubt. *United States v. Blount,* 98 F.3d 1489, 1494 (5th Cir.1996). The evidence is viewed in "the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury." *United States v. McCord,* 33 F.3d 1434, 1439 (5th Cir.1994) (internal quotations omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995).

The crux of Satz' defense is that he was an innocent employee of mysterious higher-ups who actually owned and ran the various enterprises. During his testimony and through his cross-examination of government witnesses, Satz argued that the $299 fee was simply a payment for a self-help book that was given to customers on how to repair one's credit history. Satz contended that he did not intend to defraud and that there was no fraudulent scheme. He asserts that the Financial Plus telemarketer's script contained no material misrepresentations, and while individual telemarketers may have materially altered the original script in communications with customers, he argues that the evidence conflicts as to whether he was aware of these "deviations" from the telemarketing script, and there is no evidence that Satz himself encouraged or condoned such misrepresentations.

The evidence and testimony at trial, however, contradict Satz's assertions. Satz's former wife, Ubol Satz, testified that while Satz may have initially been hired to work for some people in Miami who were running a scheme similar to Satz's Texas operations, Satz split off from these employers and went into partnership with another unidentified individual, running his own "loan rooms." Other evidence indicated that Satz organized American Financial and Financial Plus, hired the employees, and knew that no loans were being given out. While organizing the telemarketing companies and leasing locations, Satz attempted to conceal his role through the use of false identities, aliases, and intermediaries. Satz recruited, trained, and di-

rected employees at the various locations, including Gray and Luchkowec. Satz tried to prevent employees at each office from directly dealing with employees at other offices. The telemarketer's script made no mention of Satz's assertion that the $299 fee was in exchange for a small paperback pamphlet; rather, it appears that customers were informed that they were purchasing a slim book for $299 only in fine print buried in the "order form" sent after they had already parted with the money. Satz received queries from employees regarding whether anyone actually received any loans, and through his wife he pocketed at least half of every $299 payment sent in to Financial Plus.

Viewed in the light most favorable to the verdict, there was ample evidence to conclude that Satz was guilty as charged.

■■■ Gray argues that there was insufficient evidence to support the conclusion that she was aware of the fraudulent nature of Financial Plus. She points out that Satz attempted to keep employees in the dark about the operations of the other related offices and asserts that she would not have been indicted but for the testimony of a postal investigator who she asserts erroneously linked her to some of Satz's earlier operations outside of Texas.[2] Gray also emphasizes that government witnesses who had been employees of the telemarketing scheme did not testify that Gray was aware of the fraudulent nature of the enterprise.

Independent of Satz's actions, whether Gray ever told anyone she knew of the scheme, or the conclusions of the postal investigator, Gray's duties and her actions while employed at American Financial and Financial Plus incriminated her. While Gray may have been unaware of the scheme when she first went to work for Satz at American Financial as a low level employee, by the time she was manager of Financial Plus there was evidence she was more than an innocent employee kept in the dark by Satz. Even at American Financial, Gray received so many complaint calls that she would leave the complaint line off the hook in order to get other work done. Handwriting identified to Gray indicates that she received complaint letters while at American Financial containing newspaper clippings describing similar loan scams. Contrary to her testimony at trial that numerous refunds were made while she was at Financial Plus, Gray's communications with Satz reveal that such refunds were the exception, not the rule. Gray wrote Satz that for the week of December 11, 1991, she had made only two refunds notwithstanding fourteen requests. She also told Satz in that letter that one of those refunds was made "to shut [a customer] up" after the customer had complained and caused Airborne Express to withhold deliveries to Financial Plus. These complaints clearly put Gray on notice that Satz's operations were shady; her efforts to prevent customers from receiving refunds suggest a knowing participation in the conspiracy.

Further, Gray engaged in active deception while at Financial Plus. Gray testified at trial that she knew nothing about the books Satz claims to have been selling for $299, but she stated to Satz in writing that she had dealt with a television news crew that attempted to investigate Financial Plus by informing them that Financial Plus was a publisher of "financial literature" rather than a lending operation. Gray used the alias "Sue Steiner" at work and suggested to Satz that Financial Plus use the name of one of its

2. Gray's husband and Satz share the same first name. Gray contends that she informed coworkers that she "worked with Mike in Michigan," referring to her husband, but some of her coworkers mistakenly interpreted this as referring to Michael Satz and told the postal investigator who investigated Financial Plus and American Financial in 1991 that Gray had worked for Satz before coming to Dallas. Gray argues that this confusion led the postal investigator to reach the erroneous conclusion that Gray had previous dealings with Satz before American Financial, and that she would not have been convicted or even indicted but for this mistake. Whether Gray had known Satz before American Financial is irrelevant, however, because the government conceded both in opening statement and in closing argument that when Gray first went to work for Satz at American Financial in Dallas, she was probably not aware the business was fraudulent. As will be discussed, *infra*, there is ample evidence to show that Gray was aware of the fraud by the time she moved to Financial Plus, and evidence that Gray's dealings while employed by Satz were less than trustworthy.

employees, Joanie Day, on certain transactions to avoid using the name of the business. Several former employees testified that they knew Financial Plus was a scam from within a few days to a month, but Gray testified that she was unaware that Financial Plus was an illegitimate business until right before the office was shut down. Gray also reassured inquisitive employees that Financial Plus was legitimate; ironically, Gray compared American Financial (Gray's former place of employment) to Financial Plus, stating that the former was a "rip-off" and not legitimate. Gray also knew that at least one telemarketer was making egregious misrepresentations over the phone.

Based on this evidence, and viewed in the light most favorable to the verdict, the jury had sufficient evidence to find Gray guilty.

C. Jury Instructions.

 Gray argues that it was improper for the district court to give a "deliberate ignorance" instruction because there was no evidence to raise the inference that Gray willfully blinded herself to the fraudulent nature of the business. We review challenges to jury instructions to determine "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. August*, 835 F.2d 76, 77 (5th Cir.1987). The district court's charge must be legally accurate and factually supported by the evidence. *United States v. Lara–Velasquez*, 919 F.2d 946, 950 (5th Cir. 1990). In evaluating the whether the evidence is sufficient to support the jury charge, we "view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Government." *Id.*

 The district court instructed the jury:

You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

The deliberate ignorance instruction presents the danger that a jury will convict a defendant on the basis of the lesser *mens rea* of negligence—punishing the defendant for what he should have known. Circumstances rarely warrant the use of this instruction. *United States v. Lara–Velasquez*, 919 F.2d 946, 951 (5th Cir.1990). Nevertheless, when the defendant claims he lacks the requisite guilty knowledge, such an instruction is appropriate if the trial evidence raises two inferences: "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *Id.*

 Gray was questioned by her own employees about the legitimacy of Financial Plus. She was aware that telemarketing scams existed and regularly handled calls from irate loan applicants who had received no money. The evidence was clearly sufficient to support an inference that Gray was aware of the high probability that Financial Plus was fraudulent. Gray made no attempt, other than possibly directing queries to Satz, to discern whether anything was amiss. In fact, the evidence indicates Gray actively tried to prevent inquiry from others into Financial Plus' dealings by thwarting a television news crew with a cover-up story and dissuading customers from taking action against Financial Plus. These facts support the inference that Gray, at the very least, purposely contrived to avoid learning about Financial Plus's fraudulent nature. The trial evidence sufficiently supported the deliberate ignorance instruction.

 Gray also contends that the district court further diluted the jury instruction by including the statement "it is only required that the government's proof exclude any 'reasonable doubt' concerning the defendant's guilt." This assertion is meritless. *United States v. Alonzo*, 681 F.2d 997, 1002 (5th Cir.1982), *cert. denied*, 459 U.S. 1021, 103 S.Ct. 386, 74 L.Ed.2d 517 (1982). Finally, Gray argues the jury instruction was also

impermissibly diluted by omitting any instruction regarding specific intent. We note, however, that the district court's written charge to the jury informed the jury that there must be proof beyond a reasonable doubt that the defendant "knowingly creates or participates in a scheme to defraud," and "[t]hat the defendant acted with the specific intent to defraud." The jury was also instructed that acting with the intent to defraud "means to act knowingly and with the intention or purpose to deceive or to cheat." We conclude that the trial court's instruction regarding intent was sufficient.

### D. *Brady* violation.

 In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. A defendant must show that there was suppressed evidence that was favorable to the defendant and material to guilt or punishment. *United States v. Neal*, 27 F.3d 1035, 1050 (5th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 530, 130 L.Ed.2d 433 *and cert. denied,* — U.S. ——, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995). The suppressed evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

Satz asserts that the government has committed a *Brady* violation. Satz argues that the government, prior to Satz's trial in Judge McBryde's court, possessed documents that were exculpatory for him. Shortly before his sentencing by Judge McBryde, the documents in question had been obtained from the United States Attorney's office in Phoenix, Arizona, which was investigating other fraudulent telemarketing offices. Satz argues that four of these documents should have been disclosed by the government for Satz's defense at trial. These four documents consisted of order forms and other documentation bearing the names of the company owners who, Satz argued at trial, were the real masterminds behind the telemarketing organizations for which Satz was being prosecuted.

 These documents, however, predate the initiation of the fraudulent scheme at issue before us; none of the documents referred to by Satz mention any of the organizations for which Satz was convicted in the instant case. Nor do they contradict testimony by Satz's wife that Satz had worked for other people in the Miami area before departing with another partner to open new telemarketing rooms. Thus, the documents offer little or no support for the argument that Satz was not the real owner or organizer of the Texas loan operations. Some of the documents turned over to the district court by the Arizona United States Attorney's office apparently link Satz to earlier Miami area operations, in some cases in a managerial capacity. Thus, the documents, viewed as a whole, were at least as harmful to Satz as they were potentially helpful. Finally, we note that Satz's counsel had received the documents before the sentencing hearing, yet failed to object to the district court at the sentencing hearing that the documents should have been disclosed at trial. There was no *Brady* violation.

### E. Recusal from sentencing.

 Recusal by a trial judge is required when "a reasonable and objective person, knowing all of the facts, would harbor doubts concerning the judge's impartiality." *United States v. Wilson,* 77 F.3d 105, 110 (5th Cir.1996). The denial of a motion to recuse is reviewed for an abuse of discretion. *Id.* Satz failed to request that the trial judge recuse himself. Although his failure timely to seek recusal may amount to a complete waiver, for the sake of argument, we shall review for plain error. Fed.R.Crim.P. 52(b).

 Satz argues that the district court should have recused himself from sentencing based on an exchange during the sentencing hearing between the district court and the Arizona United States Attorney's Office, in which the district court became aware of

some double jeopardy concerns regarding a similar telemarketing prosecution in Arizona involving Satz. Satz argues the district court in the instant case was somehow put in the position of either postponing sentencing in Texas or imposing the maximum sentence possible. Nothing occurred during the sentencing hearings that impugns the district court's motivations toward Satz or his application of the law. The district court's ire was directed not at Satz but at the U.S. Attorney's office. Satz has failed to show that a reasonable person would doubt the trial court's impartiality toward him in any way. There was no basis for recusal.

F. Application of the sentencing guidelines.

Each of the appellants contests on various grounds the district court's application of the sentencing guidelines. We review a trial court's factual findings at sentencing for clear error and its legal application of the sentencing guidelines de novo. *United States v. Clements*, 73 F.3d 1330, 1338 (5th Cir.1996).

1. Calculation of Loss Amounts

a. Satz

The district court found that losses to the victims, on or after November, 1990, associated with the operation of at least nine separate telemarketing rooms, totaled $3,400,000, and held Satz responsible for them. Because the amount of losses excluded $2,500,000, his offense level was increased by 13 points pursuant to U.S.S.G. § 2F1.1(b)(1)(N).

Satz argues that the district court erred in calculating the loss attributable to him for several reasons. First, Satz contends the $778,000 losses attributed to one operation, Financial Services of America, should not have been included in the total amount of loss because Satz allegedly joined that operation after it started and the losses were not apportioned accordingly. As the district court noted in response to this objection during sentencing, even without that amount, the resulting sum attributable to Satz would still exceed the $2,500,000 minimum for a 13 point offense level increase.

Any error in including the entire $778,000 was harmless.

Satz next contends that the district court erred by relying on hearsay evidence in the presentencing report to calculate the loss for six of the nine offices with which Satz was involved. Specifically, Satz asserts that the probation officer's report contained firsthand knowledge of loss for only three of the nine telemarketing offices. Satz provided no rebuttal evidence and did not, prior to the sentencing hearing, contest the factual assertions contained in the presentencing report with sworn denials. We have held that a district court has discretion to adopt a presentencing report's facts without more specific inquiry or explanation where the defendant presented only general unsupported objections to the report. *United States v. Rodriguez*, 897 F.2d 1324, 1327–28 (5th Cir.1990), *cert. denied*, 498 U.S. 857, 111 S.Ct. 158, 112 L.Ed.2d 124 (1990). Further, while a presentencing report may be relied on by the trial judge as evidence in determining a sentence, unsworn assertions by the defendant are unreliable and not to be considered. *United States v. Lghodaro*, 967 F.2d 1028, 1030 (5th Cir.1992). We have also held that a court may rely on hearsay testimony from law enforcement officials at sentencing hearings. *United States v. Cuellar–Flores*, 891 F.2d 92, 93 (5th Cir.1989). In the instant case, the probation officer either relied on firsthand knowledge or the findings of other law enforcement investigators. Additionally, trial testimony of an employee of Allstate Financial and a summary of evidence by a state investigator that linked Satz to the various rooms and evinced the amount of loss from each room corroborated the amounts attributed to Satz in the presentence report. The district court did not commit clear error in determining the amount of loss for sentencing purposes.

b. Luchkowec

The district court held Luchkowec accountable for $685,543 in aggregate loss and increased his total offense level by ten levels pursuant to U.S.S.G. § 2F1.1(b)(1)(K). This figure was based on Luchkowec's employment for two weeks with U.S. Funding, fol-

lowed by his employment with Citizens Capital in the same capacity. Luchkowec argues the district court erred in holding him liable for this amount because his duties with these two companies were allegedly purely ministerial and therefore, Luchkowec claims, he could not foresee the amount of money involved in the scheme.

Under the sentencing guidelines, a defendant is accountable for all relevant conduct, *United States v. Sotelo*, 97 F.3d 782, 799 (5th Cir.1996), a concept that includes his own conduct and the foreseeable acts of co-conspirators. U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Maseratti*, 1 F.3d 330, 340 (5th Cir.1993), *cert. denied*, 510 U.S. 1129, 114 S.Ct. 1096, 127 L.Ed.2d 409 *and cert. denied*, —— U.S. ——, 114 S.Ct. 1552, 128 L.Ed.2d 201 *and cert. denied*, —— U.S. ——, 115 S.Ct. 282, 130 L.Ed.2d 198 (1994). The question here is whether he could reasonably foresee the losses caused by U.S. Funding and Citizens Capital during his employment. The trial evidence showed that Luchkowec received faxes from the "loan broker," and then, without ever doing a credit check or other investigation, called the loan applicants on the list and informed them that they were approved or preapproved for a loan and should contact the loan broker to complete arrangements. This transaction by its very nature was suspicious; two former employees of Citizens Capital testified that they knew within a few days that the operation was fraudulent. A witness confirmed that Luchkowec knew the operation at Citizens Capital was fraudulent, and Luchkowec admits in brief that his duties were the same at both offices. There was more than enough evidence to support the district court's finding that the losses suffered by the victims who were contacted by U.S. Funding and Citizens Capital during Luchkowec's employment should be attributed to Luchkowec.

#### c. Gray

The presentencing report stated that "the loss [attributable to Gray] at American Financial totaled $300,000 during [Gray's] employment and the loss at Financial Plus totaled $117,806, for an aggregate total loss of $414,514." Gray argues that the entire loss attributed to her was not foreseeable. As noted, *supra*, a co-conspirator is liable for the foreseeable acts committed by himself and the other co-conspirators committed in furtherance of the conspiracy. Gray contends, however, that the district failed to make explicit findings as to which portion of the loss could accurately be attributed to Gray. Yet the district court did not attribute the entire loss of $414,514 to Gray. Rather, the court found that Gray became aware of the fraudulent scheme shortly after she began work for American Financial, and he concluded that the loss foreseeable by her "was at least more than $350,000," the sentencing guideline minimum for a base level increase of nine for loss caused by fraud. *See* U.S.S.G. § 2F1.1(b)(1)(J). As has been discussed, Gray received many indications from the beginning that the scheme was fraudulent. Based on the trial record and presentencing report, the finding of loss was not clearly erroneous.

#### 2. Enhancement for Leadership Roles.

Pursuant to U.S.S.G. § 3B1.1(a), the district court found that Satz was a leader or organizer of a criminal scheme, and increased his offense level by four. The district court also found that Gray and Luchkowec were managers or supervisors of a criminal scheme, and increased their offense level by three, as directed by U.S.S.G. § 3B1.1(b). All three defendants object to these enhancements.

Satz's contention that he was a foot soldier for others who led the fraud scheme is meritless. Similarly, Gray and Luchkowec argue that they had limited supervisory or other authority, despite the title of manager each of them held at their respective offices. The evidence contradicts their contention and indicates that both defendants ran their respective offices and played more than a ministerial role in the scheme. Gray had the discretion to refund loans, gave directions to the other telemarketers, and responded to the employees' suspicions of fraud. Luchkowec hired employees for Citizens Capital, oversaw its daily activities, and was the person to whom employees addressed their concerns about the legitimacy of the operation.

The district court did not commit clear error in finding that Satz, Gray and Luchkowec deserved increased offense levels for their roles in the scheme.

### 3. Obstruction of Justice Enhancement.

■ The district court found that Gray and Luchkowec perjured themselves during their trial testimony, consequently, he increased their offense levels by two for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. A district court's finding of obstruction of justice pursuant to § 3C1.1 is a factual finding which we review for clear error. *United States v. Upton*, 91 F.3d 677, 687 (5th Cir.1996).

#### a. Gray

The presentencing report placed obstruction of justice before the district court particularly based on the charge that Gray testified falsely at trial concerning what she told a postal inspector investigating the fraud scheme.[3] The district court ultimately found Gray had given perjured testimony on an entirely separate ground urged by the government—Gray testified at trial that she was unaware until after she had already joined Financial Plus as its manager that Satz's operations were fraudulent, a statement the court found to be a "clear-cut falsehood."

It is not clear from Gray's brief whether she understands the basis for the finding of obstruction of justice. Gray argues that the district court found she obstructed justice on a ground for which she had no advance notice—her assertion that she was not aware of a fraudulent scheme when she went to work for Financial Plus. Gray contends that this finding was based solely on the district court's rejection of Gray's presumption of innocence. Gray also seems to argue, however, that her increased offense level for perjury should be reversed because the statements attributed to her by the postal inspector regarding who had originally hired

her were incorrect and collateral to the issues at trial. Additionally, Gray contends that her sentence enhancement for obstruction of justice was an unconstitutional conviction without the benefit of a grand jury or jury trial.

■ Gray's arguments are meritless. To begin with, the district court did not find that Gray obstructed justice because of her statements at trial regarding what she told the postal inspector; what she actually told the postal inspector is irrelevant. We disagree with Gray's assertion that she had no notice that the district court would find she obstructed justice on an alternate ground—the presentencing report refers to Gray's testimony as being "in direct contradiction to the evidence" about her guilty knowledge. The district court, after recalling the trial evidence, found that Gray lied about her knowledge of the scheme. The district court's finding of obstruction of justice was not clearly erroneous.

We also reject Gray's argument that the increase for obstruction of justice based on perjured testimony is unconstitutional. Gray cites no cases that actually support her position. Gray argues that an upward departure in sentencing requires a jury. The case that Gray cites to support this proposition, however, *McMillan v. Pennsylvania*, 477 U.S. 79, 80, 106 S.Ct. 2411, 2413, 91 L.Ed.2d 67 (1986), specifically states that "[t]here is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact." Finally, the Supreme Court has upheld an obstruction of justice sentence enhancement based on a defendant's perjury at trial. *United States v. Dunnigan*, 507 U.S. 87, 98, 113 S.Ct. 1111, 1118, 122 L.Ed.2d 445 (1993).

#### b. Luchkowec

Luchkowec argues that his upward departure for obstruction of justice is clearly erro-

---

**3.** The postal inspector who interviewed Gray after Financial Plus was shut down wrote that Gray said she had been originally hired by a man named Bill Richards. At trial, Gray denied under questioning by Satz's attorney that she had told the postal inspector she had been hired by Richards. At sentencing and on appeal, Gray

contends that the postal inspector was confused, and added the name Bill Richards to a handwritten report after the interview with Gray was over. Gray argues that the postal inspector mistakenly inserted Bill Richards' name at points in Gray's account where Gray was actually talking about Satz.

neous, because it was based simply on the conflict between his testimony at trial and that of two of the government's witnesses. One of the witnesses testified that Luchkowec had admitted that Citizens Capital was a scam, while the other witness testified that Luchkowec helped him assemble a rather suspiciously *ad hoc* payment book that was sent to the one customer who received a loan in this scheme. The district court concluded from these contradictions in his testimony that Luchkowec had testified falsely regarding matters material to his guilt or innocence. Luchkowec cites no case law to support his contention that the district court's finding was in error; the finding must be affirmed.

## III. CONCLUSION

For these reasons, the convictions and sentences meted out to appellants are AFFIRMED.